| | |
|---|---|
| JENNIFER RICE, and ERIK WESTERVELT, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. 2:24-cv-2647-AB |
| vs. | Jury Trial Demanded |
| WELLS FARGO BANK, NATIONAL ASSOCIATION; and DOES 1-10, inclusive, | |
| Defendant(s). | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT WELLS FARGO BANK, N.A.'S MOTION TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, DISMISS PLAINTIFFS' <u>FIRST AMENDED COMPLAINT</u>**

## I.    Introduction

This case arises out of Defendant Wells Fargo Bank, National Association's ("Defendant") inadequate security measures facilitating an unauthorized wire transfer of nearly $25,000 out of Plaintiffs' savings account. Instead of stopping the unauthorized transfer or reimbursing Plaintiffs for the lost funds—as the law requires it to—Defendant decided to make its failures Plaintiffs' problems, and forced them to bear the loss of the stolen funds. Defendant has done this to scores of consumers across the country.  Plaintiffs, left

with no other recourse, filed this class action lawsuit to obtain redress for this injustice on behalf of themselves and other consumers nationwide.

Now, however, Defendant seeks to enforce an illusory arbitration agreement in its deposit account agreement, and asks this Court to compel this case into arbitration. But the truth is that there is no agreement to arbitrate to enforce. This is because Defendant utilized its extraordinarily disparate bargaining power over Plaintiffs—two ordinary consumers—to grant itself unlimited power under the contract to modify any aspect of the arbitration agreement at any time, without notice to Plaintiffs, and without giving Plaintiffs an opportunity to reject those changes. What's more, there is nothing in the contract stopping Defendant from applying any such changes retroactively. Defendant can change the rules of the game however it wants at any time, without notice. It has effectively committed itself to nothing under the arbitration agreement. Courts within the Third Circuit have consistently held that this kind of illusory arbitration agreement lacks mutuality and consideration and cannot be enforced. This Court should do the same and deny Defendant's Motion.

In the alternative, Defendant asks this Court to dismiss Plaintiffs' claims under Rule 12(b)(6) for failure to state a claim. Defendant claims that Plaintiffs' claims under the Electronic Funds Transfer Act ("EFTA") fail because all wire transfers are exempted from EFTA. But the regulations upon which Defendant

makes this argument no longer receive deference following the Supreme Court's ruling in *Loper Bright Enterprises*, and all of the authority relied upon from Defendant is no longer good law. Defendant cites no authority, because 100% of its authority has been superseded by the recent Supreme Court decision. Instead, the plain language of EFTA controls. Defendant therefore waived a plain meaning and statutory construction argument. But even if that were not the case, Defendant's position cannot be squared with the language Congress enacted. At least some wire transfers are covered by EFTA, and Defendant's argument to the contrary should be rejected.

Defendant's argument regarding Plaintiffs' alternative claims under the UCC also misses the mark. Plaintiffs' allegations are essentially that a suspected fraudster somehow gained access to Defendant's systems and utilized the information contained in those systems to defraud Plaintiffs and authorize the wire transfer at issue. Defendant's position can be boiled down to an argument that even though Defendant allowed a fraudster to breach its systems and access Plaintiffs' accounts and information, it is nonetheless not liable for the consequences of that breach because Plaintiffs unknowingly provided the last piece of the puzzle the fraudster needed to gain access to their funds, which occurred after the security breach by Defendant already happened. But the UCC is clear: Defendant is liable for unauthorized wire transfers that occur on its watch

if it acted in bad faith or outside of the parameters of its security procedures. Defendant's position is nonsensical and is not supported by the case law. Multiple courts have held that similar allegations are sufficient to survive a motion to dismiss. Defendant's Motion should be denied.

## II. Statement of Facts

On December 22, 2023, Plaintiff Erik Westervelt received a phone call from someone claiming to be a representative from Defendant's fraud department. FAC ¶ 12. The individual called from the same number that was listed as Defendant's phone number on Plaintiffs' debit cards. *Id.* The caller accurately identified several transactions on Plaintiffs' accounts, and then advised Plaintiff Westervelt that there was a pending wire transfer for "a large amount of money." *Id.* at ¶¶ 13–14. Westervelt denied sending any such wire transfer, and the caller informed him that she could stop the wire transfer if he could confirm his identity by providing her with a six-digit code that she was going to send him. *Id.* at ¶¶ 15–16. As soon as Westervelt provided the code, a wire transfer in the amount of $24,557.89 was made from Plaintiffs' account to an unknown account with Discover Bank. *Id.* at ¶ 17. Plaintiffs deny ever having initiated such a wire transfer. *Id.*

Westervelt immediately contacted Defendant, who advised him to go to his local branch for assistance. *Id.* at ¶ 18. Westervelt did so, and a banker at his

local branch facilitated a call with Defendant's fraud department. *Id.* at ¶ 19. The fraud department confirmed that it had received Plaintiffs' dispute, and would respond in the next ten days. *Id.* at ¶ 20. Defendant ultimately refused to do anything about the unauthorized wire transfer and, to this day, has not returned the funds to Plaintiffs. *Id.* at ¶¶ 21–32.

Plaintiffs filed the instant lawsuit on June 17, 2024. Dkt. No. 1. Defendant moved to compel arbitration or dismiss Plaintiffs' Complaint on August 21, 2024. Dkt. No. 7. Thereafter, Plaintiff filed the operative First Amended Complaint on August 30, 2024. Dkt. No. 9. The Parties then agreed to a briefing schedule for the instant Motion, which the Court approved on September 10, 2024. Dkt. Nos. 11 & 15. Defendant filed the instant Motion to Compel Arbitration, or in the alternative to Dismiss on September 20, 2024. Dkt. No. 20.

Accompanying Defendant's Motion is the Declaration of Wendy Hernandez, which includes the relevant agreements that Defendant bases its motion on. *See* Decl. of Wendy Hernandez, Dkt No. 20-4 ("Hernandez Decl.). Exhibit B to Ms. Hernandez's declaration is the original deposit account agreement that was in effect when Plaintiffs opened their accounts with Defendant. (the "Original Agreement"). The Original Agreement provides for binding arbitration of disputes pursuant to the American Arbitration Association's ("AAA") Commercial Arbitration Rules. Hernandez Decl. ¶ 3, Ex. B at 5. It also

provides that Defendant "in its sole discretion" may change any term of the agreement, including the arbitration agreement, at any time without notice. *Id.* at 41.

Attached to Ms. Hernandez's declaration as Exhibit C is the current agreement (the "Operative Agreement"), which had been modified from the Original Agreement pursuant to the above provisions. *See* Hernandez Decl. ¶ 4, Ex. C. The Operative Agreement also provides for binding arbitration, and contains a nearly identical modification provision. *See id.* at 35–36, 38.

## III. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–10, requires federal courts to enforce written agreements to arbitrate disputes. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). The FAA establishes a "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). However, a court cannot direct parties to arbitration unless the agreement to arbitrate is valid. *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 264 (3d Cir. 2003). Certainly, "a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so." *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 524 (3d Cir. 2009). When it is not clear from the face of the documents that a valid arbitration agreement is formed, the summary judgment standard applies to a motion to

compel arbitration and "the party opposing arbitration is given the benefit of all reasonable doubts and inferences that may arise." *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 620 (3d Cir. 2009).

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The question at the pleadings stage "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215–16 (3d Cir. 2002). "To survive dismissal, a complaint must allege facts sufficient to raise a right to relief above the speculative level." *Hopkins v. Yesser*, 412 F.Supp.3d 517, 522(E.D. Pa. 2019) (internal quotations omitted).

## IV. Argument

### A. Defendant's Motion to Compel Arbitration should be denied.

i. <u>The Consumer Deposit Account Agreements give Defendant the unfettered right to modify the terms of the arbitration agreement, and they are therefore illusory and lack consideration.</u>

It is well established that state contract law governs the formation of arbitration agreements. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d

156, 160 (3d Cir. 2009). A contract is validly formed under Pennsylvania law where there is (1) mutual manifestation of an intention to be bound by the agreement; (2) terms sufficiently definite to be enforced; and (3) consideration. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002). An illusory promise, however, cannot serve as consideration. *See Mid-American Salt, LLC v. Morris Cnty. Coop. Pricing Council*, 964 F.3d 218, 232 n. 4 (3d Cir. 2020).

Under Pennsylvania law, a promise is illusory if it "is entirely optional with the promisor." *Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super. Ct. 1992); *Barton v. Hewlett-Packard Co.*, 635 Fed.Appx. 46, 48 n. 4 (3d Cir. 2015). "When one party may terminate or change the agreement at will, he is not in fact obligated to do anything under the contract [and] the agreement fails for lack of consideration." *Jean v. Bucknell Univ.*, No. 20-cv-01722, 2021 WL 1521724, at *12 (M.D. Pa. Apr. 16, 2021). "As a general matter, 'an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory." *Crump v. MetaSource Acquisitions, LLC*, 373 F.Supp.3d 540, 545 (E.D. Pa. 2019) (quoting *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002)); *see also Blair*, 283 F.3d. 595, 604 (3d Cir. 2002).

In *Crump*, the defendant moved to compel arbitration based on an arbitration provision in an employee handbook signed by the plaintiff. *Crump*, 373 F.Supp.3d at 542–43. There, the employee handbook provided that the

defendant could unilaterally make changes to the employee handbook (and therefore the arbitration agreement contained inside it) in writing, and could do so without giving any notice to the plaintiff. *Id.* at 546. The employee handbook specifically stated that the employer "reserve[d] the right to revise, delete, and add to the provision" of the contract and that the contract "may be modified at the sole discretion of the Company with our without cause or notice at any time." *Id.* at 543. Additionally, there was no term in the employee handbook allowing the plaintiff to reject any modifications. *See id.* at 546. And the employee handbook was silent as to whether modifications could apply retroactively. *Id.* The Eastern District of Pennsylvania thus concluded that the defendant had "unfettered discretion" to modify the arbitration agreement, and therefore the agreement was illusory and lacking consideration. *Id.* at 546–47.

The agreements in this case are exactly like the one in *Crump*. Here, as in *Crump* both the Original Agreement and the Operative Agreement allow Defendant to unilaterally make changes to any terms in the Agreement—including the arbitration agreement. *See* Hernandez Decl. ¶¶ 3–4, Ex. B at 41, Ex. C at 38.[1] In fact, the language in the Original Agreements is nearly identical to the language in *Crump*—"The Bank may in its sole discretion . . . change this

---

[1] In fact, Defendant has made such unilateral changes to the arbitration agreement over the years. *Compare* Hernandez Decl. ¶ 2, Ex. B at 5–6 *with* Hernandez Decl. ¶ 3, Ex. C at 35–36.

*Agreement* by adding new provisions or by modifying or deleting existing provisions." Hernandez Decl. ¶ 2, Ex. B at 41. As is the language in the Operative Agreement—"We may change the terms of this Agreement . . . at any time by adding new terms or conditions, or by modifying or deleting existing ones." Hernandez Decl. ¶ 3, Ex. C at 38. As in *Crump*, the Original Agreement and Operative Agreement allow Defendant to make changes without providing notice to Plaintiffs (unless otherwise required by a specific law). *Id.* And just as in *Crump*, neither the Original Agreement nor the Operative Agreement contain a term allowing Plaintiffs to reject modifications made by Defendant. *See id.* Finally, as in *Crump*, neither the Original Agreement nor the Operative Agreement specify whether modifications by Defendant may apply retroactively. *See id.* Thus, just as in *Crump*, Defendant's agreements give it the unfettered right to modify the arbitration agreement, and the arbitration agreement is illusory. *Crump*, 373 F.Supp.3d at 546–47; *Jean*, 2021 WL 1521724 at *12–13.

To illustrate why this kind of unfettered discretion to modify an arbitration agreement is problematic, consider for a moment the following hypothetical. If the Court were to grant Defendant's Motion and order this case to arbitration, the modification provisions of the Original and Operative Agreements would enable Defendant to immediately modify the arbitration agreement to require Plaintiffs to advance all of the arbitration fees for both parties and apply that modification

retroactively, or to revert to the Original Agreement, which permits unconscionable costs splitting. Defendant could do so without even notifying Plaintiffs and without giving Plaintiffs an opportunity to reject that modification. Defendant will object that it would never do such a thing and that there are other legal remedies available to Plaintiffs to prevent such conduct. But that's not the point.[2] The point is that the <u>contract</u> allows it to do this. Because Defendant can change the arbitration agreement at will, it can effectively change the rules of the game at any time without notice. In reality, Defendant has not agreed to anything with respect to arbitration. That is not consideration. *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 209 (5th Cir. 2012) ("[T]he fundamental concern driving this line of case law is the unfairness of a situation where two parties enter into an agreement that ostensibly binds them both, but where one party can escape its obligations under the agreement by modifying it.").

The result is that there was no "exchange [of] mutual promises to arbitrate claims," between the Parties. *Lomax v. Vivint Solar Developer, LLC,* No. 20-cv-1774, 2020 WL 6781939, at *5 (E.D. Pa. Nov. 18, 2020). As consideration is a foundational element of contract formation, Defendant's decision to grant itself unlimited discretion to modify the arbitration agreement results in no agreement

---

[2] Also, Defendant already has done it at least once, so such assurances lack credibility.

being formed at all. *See Crump*, 373 F.Supp.3d at 546–47. This is true for the arbitration agreement contained in the Operative Agreement, the delegation clause contained in it, and for the arbitration agreement in the Original Agreement. Under Pennsylvania law, there is no agreement to arbitrate between the Parties, and Defendant's Motion should be denied.

Defendant will undoubtedly ask the Court to sever the provisions of the Original and Operative Agreements allowing it to make unilateral changes to the arbitration agreement. There are several problems with this position. First, because the promise to arbitrate made by Defendant is illusory, no contract has been formed at all—there is no arbitration agreement for the Court to sever terms from in the first place. *Id.*; *Mid-American Salt, LLC*, 964 F.3d at 232 n. 4; *Lomax* 2020 WL 6781939 at *5.

Second, even if there was a validly formed arbitration agreement from which the Court could sever terms (there is not), it would be inappropriate to do so. Under Third Circuit precedent, there are two questions a court must ask in deciding if severing terms is appropriate. *Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 206 (3d Cir. 2010). The Court must first ask if the terms to be severed are an essential part of the bargained-for exchange. *Id.* And then the Court must ask if the terms to be severed place a party at a "severe disadvantage," such that the "cumulative effect of so much illegality," prevents the Court from enforcing

the agreement. *Alexander v. Anthony Intern., L.P.*, 341 F.3d 256, 271 (3d Cir. 2003). The unilateral modification terms drafted by Defendant undoubtedly fall into this second category, such that severing them would be inappropriate. *Jean*, 2021 WL 1521724, at *22 (declining to sever terms allowing defendant to unilaterally alter arbitration agreement).[3]

And finally, even if the Court were to sever the terms allowing Defendant to modify the agreements, the result is that the modifications Defendant made to the Original Agreement are wholly ineffective, making the Original Agreement the operative one. But, as discussed below, the arbitration agreement in the Original Agreement is grossly unconscionable and unenforceable. Defendant's Motion should be denied.

ii. The arbitration agreement contained in the Original Agreement is unconscionable under Pennsylvania law.

"To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable." *Quilloin v. Tenet Health System Philadelphia, Inc.*, 673 F.3d 221, 230 (3d Cir. 2012). "Judges applying Pennsylvania law often employ a 'sliding scale'

---

[3] It is worth noting that in *Jean* the court analyzed the illusory contract issue, in part, under an unconscionability standard. As a result, the court considered whether to sever the terms allowing the defendant to modify the agreement as unconscionable. The court did not discuss whether the illusory nature of the contract resulted in a lack of consideration and no formation at all, but instead ultimately rejected the arbitration agreement as unconscionable. *Jean*, 2021 WL 1521724 at *12–13.

approach to determine unconscionability, meaning 'where the procedural unconscionability is very high a lesser degree of substantive unconscionability may be required and presumably, vice-versa.'" *Jenkins v. PetSmart, LLC*, No., 2023 WL 8548677, at *9 (E.D. Pa. Dec. 11, 2023) (quoting *Quilloin*, 673 F.3d at 230).

1. The Original Agreement and the arbitration agreement contained therein are procedurally unconscionable adhesion contracts.

"Contracts of adhesion, such as standard form contracts signed by a party or consumer in a weaker bargaining position are 'generally considered to be unconscionable.'" *Hrapczynski v. Bristlecone, Inc.*, No. 20-cv-06014, 2021 WL 3209852, at *6 (E.D. Pa. July 29, 2021) (quoting *Quilloin*, 673 F.3d at 235). Certainly, "Pennsylvania courts and the Third Circuit have repeatedly opined that contracts of adhesion are generally found procedurally unconscionable because they target disadvantaged consumers." *Richards v. American Academic Health System, LLC*, No. 20-cv-00059, 2020 WL 2615688, at *6 (E.D. Pa. May 22, 2020). Factors considered in evaluating procedural unconscionability include "the take-it-or-leave-it nature of the standardized form of the document[,] the parties' relative bargaining positions, and the degree of economic compulsion motivating the adhering party." *Quilloin*, 673 F.3d at 235–36 (internal quotations omitted).

In *Doe 1 v. Darden Restaurants, Inc.*, the Middle District of Pennsylvania found that an adhesion contract was highly procedurally unconscionable where it was a form contract used nationwide and the plaintiffs were not presented an opportunity to negotiate the contract. No. 20-cv-00862, 2022 WL 265949, at *8–9 (M.D. Pa. Jan. 27, 2022). There, the defendant-employer sought to compel arbitration of employment claims based on a form contract. *Id.* at *2–3. The court noted that the contract was presented on a "take-it-or-leave-it basis," was standardized and used nationwide, and was drafted by a sophisticated business entity with legal counsel available to draft the contract. *Id.* at *8. Importantly, the court stated that the plaintiffs "could not have made changes to the [contract] even if they wanted to." *Id.* Despite the fact that some of the plaintiffs had college degrees, and the plaintiffs had the opportunity to seek employment elsewhere, the Middle District of Pennsylvania held that the adhesion contract had a "<u>high level</u> of procedural unconscionability." *Id.* at *9 (emphasis added).

This case is very similar to *Doe 1*. Here, just as in *Doe 1*, the Original Agreement was presented to Plaintiffs on a take-it-or-leave-it basis. Declaration of Jennifer Rice ("Rice Decl.") at ¶ 8; Declaration of Erik Westervelt ("Westervelt Decl.") at ¶ 8. The Original Agreement is ostensibly a form contract that is standardized for Wells Fargo customers nationwide, just as in *Doe 1*. *See* Hernandez Decl. ¶ 2, Ex. B. And just as in *Doe 1*, the Original Agreement was

drafted by a sophisticated business entity—certainly, Wells Fargo is one of the largest banks in the world, and the Original Agreement was undoubtedly drafted by Defendant's counsel. Plaintiffs had no opportunity to negotiate the Original Agreement and could not have changed its terms even if they wanted to, just like the plaintiffs in *Doe 1*. Rice Decl. ¶ 8; Westervelt Decl. ¶ 8. Thus, just as in *Doe 1*, the Original Contract is highly procedurally unconscionable. *Doe 1*, 2022 WL 265949 at *9; *Alexander v. Anthony Intern., L.P.*, 341 F.3d 256, 266 (3d Cir. 2003).[4]

And there are additional factors not present in *Doe 1* that further suggest that the Original Agreement is procedurally unconscionable. Certainly, Plaintiffs in this case have no specialized knowledge of contracts or consumer banking. Rice Decl. ¶¶ 2–3; Westervelt Decl. ¶¶ 2–3.[5] Plaintiffs were not aware that the Original Agreement contained an arbitration agreement, because nobody at Wells Fargo informed them that it did. Rice Decl. ¶ 4; Westervelt Decl. ¶ 4..[6] And similarly, Plaintiffs were unaware that the Original Agreement permitted

---

[4] Importantly, the court in *Doe 1* held that under similar facts the adhesion contract at issue was <u>highly</u> procedurally unconscionable—not just somewhat procedurally unconscionable. *Doe 1*, 2022 WL 265949 at *9. Thus, even if the Court does not believe Plaintiffs' facts rise to the same level as those in *Doe 1*, the Original Contract nonetheless is still procedurally unconscionable, but to a lesser degree.

[5] *Clerk v. First Bank of Del.*, 735 F.Supp.2d 170, 182 (E.D. Pa. 2010).

[6] *Kohlman v. Grane Helathcare Co.*, 279 A.3d 42, 48 (Pa. Super. Ct. 2022).

Defendant to unilaterally make any changes to the agreement at any time without notice. Rice Decl. ¶ 6; Westervelt Decl. ¶ 6.[7] Nor were Plaintiffs ever provided any copies of the relevant AAA arbitration rules that would govern an arbitration under the Original Agreement. Rice Decl. ¶ 5; Westervelt Decl. ¶ 5.[8] These facts all suggest that the arbitration agreement in the Original Agreement was formed through "unfair surprise," which is the hallmark of procedural unconscionability. *See Quilloin*, 673 F.3d at 235 (quoting *Witmer v. Exxon Corp.*, 495 Pa. 540, 551 n. 16 (1981)); *Jean*, 2021 WL 1521724 at *21. Moreover, the only reason Plaintiffs agreed to open joint accounts with Defendant is because Plaintiff Westervelt had been banking with Defendant for over a decade and already had all of his money deposited with Wells Fargo. Rice Decl. ¶ 8; Westervelt Decl. ¶ 8. Thus, Plaintiffs had a significant "financial compulsion," to accept Defendant's adhesion contract. *See Takiedine v. 7-Eleven, Inc.*, No. 17-4518, 2021 WL 32223070, at *6 (E.D. Pa. July 29, 2021).

Defendant is a multi-billion dollar corporation that forced this unilaterally-drafted contract on Plaintiffs—two ordinary consumers who already had money deposited with it. This alone is sufficient for the Court to conclude that the Original Agreement is procedurally unconscionable.

---

[7] *Jean*, 2021 WL 1521724 at *12–13.
[8] *Cisneros v. Am. Gen. Fin. Servs., Inc.*, No. C 11-02869, 2012 WL 3025913, at *6 (N.D. Cal. July 24, 2012).

2. The Original Agreement would require Plaintiffs to pay excessive fees to initiate arbitration and is therefore substantively unconscionable.

"[E]xpenses of the arbitrator, AAA representatives, and an witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties." Pl.'s Req. for Judicial Notice ("RJN") Ex. A at 29–30. Defendant's unfair adhesion contract effectively requires Plaintiffs to expend tens of thousands of dollars in arbitrator fees in order to bring a lawsuit after Defendant wrongfully allowed a scammer to drain their bank accounts. Under Pennsylvania law, "[s]ubstantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). "An arbitration provision that makes the arbitral forum prohibitively expensive for a weaker party is unconscionable." *Parilla v. IAP Worldwide Services, VI, Inc.*, 368 F.3d 269, 284 (3d Cir. 2004). To show that an arbitration agreement's fee arrangement is unconscionable, "a plaintiff must (1) come forward with some evidence to show the projected fees that would apply to their specific arbitrations, and (2) show the party's inability to pay those costs." *Clymer v. Jetro Cash and Carry Enterprises, Inc.*, 334 F.Supp.3d 683, 692 (E.D. Pa. 2018) (citing *Parilla*, 368 F.3d at 283–85).

In *Kauffman v. U-Haul Int'l, Inc.*, the court held that the application of the AAA's Commercial Arbitration Rules imposed unconscionable costs in an employment matter. No. 16-cv-04580, 2018 WL 4094959, at *7–8 (E.D. Pa. Aug. 28, 2018). There, the court stated that application of the AAA's Commercial Arbitration Rules would require the plaintiff to incur fees of $1,550—$750 in a filing fee and $800 in a final fee—just to file his claim. *Id.* at *7. This was independent of any fees that were due to compensate the arbitrator. *Id.* The plaintiff claimed that he could not afford such fees. *Id.* at *7–8. The court, therefore, concluded that the application of the Commercial Arbitration Rules was substantively unconscionable because the costs of arbitration under those rules were prohibitively expensive. *Id.*

Here, as in *Kauffman*, the Original Agreement applies the AAA's Commercial Arbitration Rules which requires that the expenses of arbitration be "borne equally by the parties." *See* Hernandez Decl. ¶ 3, Ex. B at 6; RJN, Ex. A.[9] And just as in *Kauffman*, Plaintiffs would be required to pay thousands of dollars

---

[9] The Original Agreement also references the AAA's "Supplemental Procedures for Consumer Related Disputes." Hernandez Decl. ¶ 3, Ex. B at 6. Defendant will likely argue that these rules apply instead of the Commercial Arbitration Rules. But the Original Agreement is silent as to which of these rules controls when there is a conflict. And moreover, while the AAA's Commercial Arbitration Rules are still active rules utilized by the AAA, the Supplemental Procedures for Consumer Related Disputes no longer exist and are not active rules utilized by the AAA. Declaration of Todd M. Friedman ("Friedman Decl.") ¶ 8.

up front under those Rules just to file their claims—$1,725 if they forego nonmonetary relief, or $6,250 if they wish to pursue nonmonetary claims. RJN ¶ 2, Ex. B. And as in *Kauffman*, Plaintiffs testified that having to pay these fees would dissuade them from pursuing their claims. Rice Decl. ¶¶ 9–11; Westervelt Decl. ¶¶ 9–11.[10] Thus, just as in *Kauffman*, Defendant's decision to apply the Commercial Arbitration Rules would force Plaintiffs to incur prohibitive fees and the arbitration agreement is therefore unconscionable. *Kaufman*, 2018 WL 4094959 at *8.

This is also to say nothing of the fact that under the Commercial Arbitration Rules Plaintiffs will share equally in the cost of the arbitrator. RJN ¶ 1, Ex. A at 29–30. The truth is that requiring Plaintiffs to pay half of the arbitrator's fees will quickly result in their out-of-pocket expense to litigate this matter in arbitration dwarfing the amount in controversy. Undersigned counsel have litigated consumer cases under the Commercial Arbitration Rules. Friedman Decl. ¶ 2. In one such case, the plaintiff was required to pay the arbitrator nearly $12,000 <u>just to review a motion and determine if the underlying dispute was arbitrable</u>. Friedman Decl. ¶ 4–6. This point bears emphasizing—the plaintiff in

---

[10] This issue of inability to pay arbitration fees is compounded by the basic facts of this case—Plaintiffs have lost approximately $25,000 due to Defendant's alleged violations of the law, and in order to vindicate their rights and get their money back they now have to spend more money on arbitration fees? That is patently unjust and unconscionable.

that case paid over $11,000 to the arbitrator (not including administrative fees) in a case where the consumer was owed approximately $100, and the case <u>did not even go to an evidentiary hearing</u>. Friedman Decl. ¶ 4–7. Arbitrator's fees consistently cost in excess of $50,000 in consumer cases. Friedman Decl. ¶ 3. The amount in controversy for Plaintiffs' individual claims is approximately $25,000 (i.e., the amount they claim Defendant wrongfully refused to refund them). FAC ¶ 17. Forcing Plaintiffs to arbitrate this case under the Original Agreement (which again, is the only agreement that could possibly be construed as validly formed due to the illusory modifications made by Defendant), will cause them to spend tens of thousands of dollars more than their claims are worth just on arbitrator's fees alone. That is outrageously unconscionable. *Kauffman,* 2018 WL 4094959 at \*8; *Clymer*, 334 F.Supp.3d at 692; *see also Kohlman v. Grane Helathcare Co.*, 279 A.3d 42, 50–51 (Pa. Super. Ct. 2022); *Alexander*, 341 F.3d at 269–70. The arbitration agreement is both highly procedurally unconscionable and highly substantively unconscionable. Defendant's Motion should be denied.

**B. Defendant's Motion to Dismiss should be denied.**

 i. <u>Whether EFTA applies to wire transfers is a question of statutory interpretation.</u>

Defendant challenges Plaintiffs' EFTA claims solely on the basis that wire transfers are not Electronic Funds Transfers under EFTA, which is based

exclusively on a CFPB regulation that no longer is given deference by this Court, pursuant to recent United States Supreme Court precedent overturning the Chevron doctrine. *See* Def.'s Mot. at 19–22. Defendant does not challenge the adequacy of Plaintiffs' EFTA allegations on any other basis, and therefore has waived its right to do so for the purposes of this Motion. *TriState HVAC Equipment, LLP v. Big Belly Solar, Inc.*, 752 F.Supp.2d 517, 529 n. 8 (E.D. Pa. 2010); *C. Albert Sauter Co., Inc. v. Richard S. Sauter Co., Inc.*, 368 F.Supp. 501, 511 (E.D. Pa. 1973). Plaintiffs will, thus, focus their briefing on the issue of whether EFTA applies to this case.

      1. Defendant's reliance on Regulation E and Federal Reserve regulations is inappropriate in light of the Supreme Court's ruling in *Loper Bright Enterprises*.

"When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2263 (2024). Thus, Courts may no longer to defer to agency interpretations of statutes even where the statute delegates authority to the agency to enact regulations under it. *See Schaffner v. Monsanto Corp.*, 133 F.4th 364, 381 n. 9 (3d Cir. 2024). Instead, "[c]ourts must exercise their independent judgment in

deciding whether an agency has acted within its statutory authority." *Loper Bright Enterprises*, 144 S. Ct. at 2273.

Defendant dedicates two full pages of its brief attempting to establish the premise that wire transfers are definitionally exempted from coverage under EFTA. *See* Def.'s Mot. at 19–22.  Yet it cites the statute exactly once. *See id.* at 20.  Instead, Defendant's argument is based almost entirely on interpretations of the law promulgated by the CFPB and the Federal Reserve. *Id.* at 20–22.  But as *Loper Bright Enterprises* counsels, these agency interpretations no longer provide the answer to this question of statutory interpretation.  It is this Court's job to determine whether wire transfers in general, and the wire transfers specifically at issue in this case, are exempted under the language of EFTA. *Loper Bright Enterprises*, 144 S.Ct. at 2263; *Schaffner*, 133 F.4th at 381 n. 9; *ATS Tree Servs., LLC v. Fed. Trade Comm'n*, No. 24.1743, 2024 WL 3511630, at *13 (E.D. Pa. July 23, 2024); *Siko v. AstraZeneca Pharmaceuticals LP*, No. 23-1184, 2024 WL 4116349, at *3 n. 4 (W.D. Pa. Sept. 9, 2024).

Defendant will likely argue that *Loper Bright Enterprises* does not apply in this context because EFTA delegates interpretive authority to the CFPB. *See* 15 U.S.C. § 1693(a)(7).  As an initial matter, it is unclear from the language of the statute whether Congress intended to delegate interpretive authority with respect to the definition of Electronic Fund Transfer, exceptions to that definition, or

both. *U.S. v. Mead Corp.*, 533 U.S. 218, 230 (2001) ("where it is in doubt that Congress actually intended to delegate particular interpretive authority, *Chevron* is 'inapplicable'" and courts should not defer to agency interpretations). But even assuming Congress did intend to delegate broad interpretive authority to the CFPB, this Court must still exercise independent judgment.

*Chevron* deference did not apply where Congress expressly delegated interpretive authority to administrative agencies. *Mead Corp.*, 533 U.S. at 227. But *Loper Bright Enterprises* is wider-sweeping than just overturning *Chevron*.[11] Justice Roberts repeatedly emphasized that interpreting the law is a "solemn duty of the judiciary." *Loper Bright Enterprises*, 144 S.Ct. at 2257 (internal quotations omitted). And while a court may "seek aid from the interpretations of those responsible for implementing particular statutes," it may not shirk its duty to independently interpret the statute. *Id.* at 2262–63. The Court may well conclude that the CFPB and the Federal Reserve got it right. But it cannot do so simply because EFTA delegated interpretive authority to the CFPB. The CFPB is given

---

[11] Defendant as a banking juggernaut is well aware of the extraordinarily broad implications of *Loper Bright Enterprises*. Counsel for Defendant, Troutman Pepper Hamilton Sanders LLP, has published numerous articles and blog posts about the decision, and has also hosted a half-hour long podcast episode discussing its implications. Defendant nonetheless bases its entire argument regarding EFTA on agency interpretations of the statute. Defendant should be foreclosed from arguing for an alternative interpretation at this time. *See TriState HVAC Equipment, LLP*, 752 F.Supp.2d at 529 n. 8.

no more deference in its interpretation than Plaintiff.  The Court must undertake an independent review of the statutory language. *Id.*

> 2. Canons of statutory construction instruct that EFTA applies to at least some wire transfers.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  "[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004); *Alston v. Countrywide Financial Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).  Defendant asks this Court to interpret 15 U.S.C. § 1693(a)(7)(B) as exempting all wire transfers from coverage under EFTA.  That interpretation is simply not supported by the plain language of the statute, and cannons of statutory construction similarly suggest that it is wrong.

For clarity, the relevant statutory provision states that the term Electronic Funds Transfer does not include:

> [A]ny transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer.

15 U.S.C. § 1693(a)(7)(B).  In light of this statutory language, Defendant's position that all wire transfers are excepted from EFTA is patently absurd.  Under

plain meaning, a wire transfer is clearly a "transfer of funds" and Wells Fargo is clearly a "financial institution." The exception, by its own terms, is quite narrow and in the context of wire transfers only applies to wire transfers made using a "service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." *Id.* (emphasis added). Thus, wire transfers made using a service that *is* designed primarily to transfer funds on behalf a consumer are Electronic Funds Transfers covered under EFTA. Plaintiffs allege that they are consumers and that their funds were transferred from their financial institution. This is covered activity under plain meaning. Multiple cannons of construction support Plaintiffs' interpretation. The cannon against surplusage counsels courts to avoid interpreting statutes in a way that would render any of the statutory language "insignificant" or "superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). If Defendant's interpretation of § 1693(a)(7)(B)—that all wire transfers are excepted from EFTA—is correct, then the second half of § 1693(a)(7)(B) limiting the exception only to transfers made using a service not designed primarily to transfer funds on behalf of a consumer is completely inoperative. Plaintiffs' interpretation, however, gives meaning to all of the words in § 1693(a)(7)(B), and is therefore the better interpretation. *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 181 (3d Cir. 2023).

The negative implication cannon, *expression unius est exclusion alterius*, similarly suggests that Plaintiffs have the superior interpretation. Under that cannon, "the expression of one thing is the exclusion of the other." *U.S. v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021). Here, § 1693(a)(7)(B) specifically expresses that it applies to wire transfers made using a service that "is not designed primarily to transfer funds on behalf of a consumer." § 1693(a)(7)(B). Thus, under the negative implication cannon, wire transfers made using a service that is designed primarily to transfer funds on behalf of a consumer are excluded from § 1693(a)(7)(B), and therefore covered by EFTA. While Defendant cites to cases where courts concluded that wire transfers are not covered by EFTA, at least two courts have stated that wire transfers may fall under EFTA's purview.[12] *See Regatos v. North Fork Bank*, 257 F.Supp.2d 632, 638 n. 10 (S.D.N.Y. 2003) ("The EFTA governs wire transfers to and from bank accounts 'established primarily for personal, family, or household purposes,'"); *Golden-Koether v. JPMorgan Chase Bank, N.A.*, No. 11-3586, 2011 WL 6002979, at *2 (D.N.J. Nov. 29, 2011).

---

[12] It should be noted that essentially all of the cases cited by Defendant for this position came to this conclusion by relying on the same agency interpretations of the statute that Defendant relies on, meaning that these cases are no longer good law because they relied on Chevron doctrine - an overturned precedent.

Simply put, if Congress wanted to categorically exempt wire transfers from coverage under EFTA, it would have said so, rather than crafting a much narrower exemption. Congress could have included all wire transfers as a separate exception under § 1693(a)(7). It did not. Congress could have alternatively omitted the qualifying language at the end of § 1693(a)(7)(B). It did not. The only logical conclusion is that EFTA applies to some wire transfers, and Defendant's interpretation of the statute is wrong.

The legislative history also suggests this is true. EFTA was designed "to create rights for consumers in an era in which banking could be conducted almost exclusively through machines, the absence of personal contact being seen by Congress as a disadvantage making such an automated system much more vulnerable to fraud, embezzlement, and unauthorized use than traditional payment methods." James Lockhart, J.D., Validity, Construction, and Application of Electronic Fund Transfer Act, and Regulations Promulgated Thereunder, 15 U.S.C.A. §§ 1693 et seq., 46 A.L.R. Fed.2d 473 (2010) (citing Sen. Rep. No. 915, 95th Cong., 2d Sess. at 3 (1978). Certainly, Congress indicated that the "most important" protection created by EFTA related to unauthorized transfer liability because the rise of electronic banking meant that a potential thief "only to utilize a computer terminal to withdraw a consumer's money." Sen. Rep. No. 915, 95th Cong., 2d Sess. at 5–6.

EFTA was enacted over 40 years ago.  In today's technological age, wire transfers—as with any transfer—can be initiated through the simple use of a computer with no face-to-face interaction whatsoever.  That's exactly what happened here.  The purpose of EFTA is to protect consumers from fraudulent transfers initiated through electronic means by placing the risk of loss on large financial institutions that are better equipped to prevent fraudulent transfers from occurring the first place. Sen. Rep. No. 915, 95th Cong., 2d Sess. at 6.  Thus, it makes no sense to categorically exempt wire transfers from coverage under EFTA, as Defendant asks this Court to do.  The text of the statute was intentionally narrowed for this reason.  Plaintiffs' interpretation is correct.  EFTA may apply to wire transfers, and Defendant's Motion should be denied.

> 3. Plaintiffs have adequately plead that the wire transfers at issue are Electronic Funds Transfers under EFTA.

Because Defendant's argument regarding EFTA rests solely on the basis that all wire transfers are excluded from EFTA, the Court could (and should) end its analysis here and deny Defendant's Motion.  Plaintiffs will nonetheless address whether their allegations are adequate under the interpretation advanced above.  At this early stage of litigation, they are.

An Electronic Fund Transfer is "any transfer of funds, other than a transaction originated by check, draft of similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer . . ."

15 U.S.C. § 1693(a)(7). As discussed above, excepted from this definition is "any transfer of funds, other than those processed by automated clearing house, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." § 1693(a)(7)(B).

Plaintiffs specifically allege that, here, the wire transfer occurred instantaneously while Plaintiff Westervelt was on the phone with the alleged scammer. FAC ¶ 17. The scam was facilitated through fraudulent phone calls, and the scammer had access to Plaintiff's online banking information such that they were able to accurately identify numerous transactions from Plaintiffs' bank account. FAC ¶ 12, 13, 16. Plaintiffs thus affirmatively allege that the wire transfer was initiated through an "electronic terminal." FAC ¶ 48. Plaintiffs further allege, upon information and belief, that the wire transfers were sent through a wire transfer service designed primarily to transfer funds on behalf of a consumer. FAC ¶ 49. Thus, under the plain language of the statute, Plaintiffs have alleged that the wire transfers at issue are Electronic Funds Transfers.

Defendant may argue that Plaintiffs' allegations are conclusory and insufficient (an argument it did not raise in its Motion and therefore waived). But Plaintiffs make specific factual allegations that allow the Court to infer that the

wire transfers are Electronic Funds Transfers.  Moreover, allegations made upon information and belief are permissible if "it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control." *McDermott v. Clondalkin Grp., Inc.*, 649 F.App'x 263, 267–68 (3d Cir. 2016). As concerns the wire transfer service utilized by Defendant here, that is precisely the case.  Plaintiffs have no way of knowing what wire transfer service Defendant utilized, how that system is structured, what its purpose or design is, or how Defendant utilizes that system.  Discovery on these issues is necessary.[13]

    ii.  <u>Plaintiffs have adequately plead violations of the UCC</u>

In the alternative to their claims under EFTA, Plaintiffs allege that Defendant violated the Uniform Commercial Code as adopted by Pennsylvania. "UCC Article 4A governs funds transfers." *Carter v. Wells Fargo Bank, National Association*, 689 F.Supp.3d 253, 256 (W.D. Va. 2023).[14]  "Whether the bank of

---

[13] Whether these types of wire transfers fit within the statutory definition of an Electronic Funds Transfer is, admittedly, a question of first impression for the Courts.  There is no set standard for determining if a wire transfer service was designed primarily to transfer funds on behalf of a consumer (presumably because courts have simply deferred to CFPB regulations, which they can no longer do). Because this is a question of first impression, it would be more appropriate to address it at the summary judgment stage after a robust factual record on the issue has been developed.

[14] There is relatively limited case law interpreting these provisions of the UCC in Pennsylvania. But "[w]hen uniform laws such as the UCC have been adopted by several states, the courts of one state may refer to decisions from another state and may construe the statutes in accordance with the construction given by that

the customer bears the risk of loss for a fraudulent wire transfer is determined by the interlocking provisions" of the UCC. *Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 650 F.Supp.3d 62, 74–76 (S.D.N.Y. 2023). The customer is responsible for fraudulent transfers that are "authorized" or "effective" under the UCC. 13 Pa. C.S. § 4A204. The bank, on the other hand, is responsible for fraudulent transfers that are not authorized or are otherwise ineffective under the UCC. 13 Pa. C.S. § 4A204.

> The UCC provides that when
>
> a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer.

13 Pa. C.S. § 4A202(b). Importantly, a funds transfer that is effective under § 4A202(b) may nonetheless be unenforceable if:

> the customer proves that the order was not caused, directly or indirectly, by a person: (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure; or (ii) who obtained access to transmitting facilities of the

---

state." *Experi-Metal, Inc. v. Comerica Bank*, No. 09–14890, 2011 WL 2433383, at *11 n.3 (E.D. Mich. June 13, 2011) (quoting *Yamaha Motor Corp., U.S.A. v. Tri–City Motor Sports, Inc.*, 171 Mich.App. 260, 429 N.W.2d 871, 876 (1988)).

customer who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating a breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault.

13 Pa. C.S. § 4A203(a)(2).

In *Carter*, the plaintiff brought UCC claims against Wells Fargo for transfers that were initiated by the plaintiff under fraudulent circumstances. *Carter*, 689 F.Supp.3d at 255–56. There, the plaintiff was contacted by a fraudster impersonating a Wells Fargo employee. *Id.* at 255. The fraudster informed the plaintiff that her financial information had been compromised and convinced her to wire money into new "secure" accounts. *Id.* Once she did so, the fraudster immediately transferred hundreds of thousands of dollars out of the plaintiff's account. *Id.* Importantly, the plaintiff alleged that she never initiated any transfers with Wells Fargo. *Id.* The Western District of Virginia held that, at the pleading stage, these allegations alone were sufficient to conclude that the transfers were not effective against the plaintiff—and the bank was therefore responsible for them—pursuant to § 4A202 of the UCC. *Id.* at 257.

This case is very similar to *Carter*. Here, as in *Carter*, Plaintiff Westervelt was contacted by a fraudster impersonating a Wells Fargo employee. FAC ¶ 12. And here, just as in *Carter*, the fraudster told Plaintiff Westervelt that his financial information had been compromised, because the fraudster indicated that a large fraudulent wire transfer was pending on Plaintiffs' account. FAC ¶ 14.

Moreover, just as in *Carter*, neither Plaintiff ever actually authorized any wire transfer. In fact, Plaintiff Westervelt was actively trying to stop what he believed to be an imminent fraudulent transfer. FAC ¶¶ 15–17. Thus, just as in *Carter*, Plaintiffs have adequately plead a violation of UCC and the wire transfer is not effective under § 4A202 of the UCC. *Carter*, 689 F.Supp.3d at 257.

Defendant argues in its brief that Plaintiffs have not adequately plead their UCC claim because they provided the fraudster with information facilitating a breach of the security procedure. *See* Def.'s Mot. at 24. This argument misses the mark. First, under 13 Pa. C.S. § 4A202, it is <u>Defendant's</u> burden to prove that the wire transfer was accepted by it in good faith and in compliance with the relevant security procedures, not Plaintiffs'. More importantly, whether Plaintiffs granted the fraudster information that facilitated a breach of the security procedure is only relevant if they are seeking to hold a transfer that is effective under 13 Pa. C.S. § 4A202(b) unenforceable. *See* 13 Pa. C.S. § 4A203(a)(2). As discussed above, Plaintiffs have adequately plead that the wire transfer was not effective under 13 Pa. C.S. § 4A202 in the first place. Multiple courts have held this to be the case under similar allegations. *See Carter*, 689 F.Supp.3d at 257; *Skin Studio Day Spa, LLC v. Wells Fargo Bank, NA*, 711 F.Supp.3d 593, 597 (D.S.C. 2024).

More directly to the argument raised by Defendant, however, Plaintiffs have alleged that the breach in the security procedure occurred <u>before</u> any code

was sent to Plaintiff Westervelt. Certainly, the fraudster called Plaintiffs from Wells Fargo's own customer service number. FAC ¶ 12. And the fraudster additionally was able to verify multiple legitimate transactions from Plaintiffs accounts, send Plaintiff Westervelt a six-digit verification code and order a wire transfer. FAC ¶¶ 13, 16–17. All these events were set in motion before Plaintiff Westervelt provided any code to the fraudster, suggesting that the breach in the security procedure was facilitated by information not disclosed by Plaintiffs.

In any event, even if the Court were to conclude that the security procedure were breached as a result of Plaintiff Westervelt providing the six-digit code to the fraudster, Plaintiffs claims still survive the Motion to Dismiss as the wire transfers are nonetheless ineffective under 13 Pa. C.S. § 4A202. Defendant's Motion should be denied.[15]

## V.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion.

---

[15] Plaintiffs will voluntarily withdraw their common law claims, without prejudice at this time.

Respectfully submitted this 11th Day of October, 2024.

LAW OFFICES OF TODD M. FRIEDMAN, P.C.

By: /s/ Todd M. Friedman

Todd M. Friedman (SBN 310961)
tfriedman@toddflaw.com
Matthew R. Snyder (SBN 335111)
msnyder@toddflaw.com
21031 Ventura Blvd., Suite 340
Woodland Hills, CA 91364
Tel: 323-306-4234

*Attorneys for Plaintiffs, Jennifer Rice and Erik Westervelt*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2024, this document was filed using the Court's CM/ECF system, and is available for viewing and download by all parties.

By:   /s/ Todd M. Friedman
          Todd M. Friedman